UNITED STATES of America, Plaintiff-Appellee,

v.

Walter E. HERR and William O. Gillentine, Defendants-Appellants.

No. 14333.

United States Court of Appeals Seventh Circuit.

Oct. 27, 1964.

Rehearing Denied Dec. 8, 1964.

608

Luis Kutner, John M. Kaveny, Albert W. Dilling, Kirkpatrick W. Dilling, Chicago, Ill., for appellants.

Edward V. Hanrahan, John Peter Lulinski, John Powers Crowley, Robert S. Atkins, U. S. Attys., Chicago, Ill., Charles H. Turner, Asst. U. S. Atty., Donald W. McKenzie, Atty., United States Securities and Exchange Commission, of counsel, for appellee.

Before SCHNACKENBERG, CASTLE and SWYGERT, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Walter E. Herr and William O. Gillentine, defendants, have appealed from judgments of the district court adjudicating defendants guilty, on the verdicts of a jury, of the fraudulent sale of securities by mail, in violation of 15 U.S.C.A. § 77 q(a) and 18 U.S.C.A. § 1341,[1] and sentencing defendants to terms of two years as to Herr and three years as to Gillentine.

American Sales Training Research Associates, Inc. (herein referred to as ASTRA), an Illinois corporation, was formed on November 7, 1959, by Gillentine and two other persons. Defendant Herr became associated with the corporation as a salesman about March 1960.

Defendants sold what they designated as distributor agreements. Sales were made through personal interviews with investors, meetings at the ASTRA offices, and correspondence through the mail.

From March 1960 through February 1961, defendants raised and ASTRA received, a total of $152,074.90 from some 72 investors. These investors were known as *inactive* distributors and their investments in the corporation were evidenced by the distributor agreements they purchased.

Typical of representations by the defendants were those shown to have been made by Herr at a meeting of some 35 to 40 prospective investors in May 1960. Investor George Klett testified that at this meeting Herr stated ASTRA had a multimillion dollar future in all its meaning; that it would have representation in every

---

1. Said violations were set forth in counts 1, 2, 4, 6, 7, 13 and 14 of an indictment. At the close of the government's case, its motion to dismiss counts 3, 8, 10 and 11 was allowed. The jury found defendants not guilty as to count 15, which charged a conspiracy, and the court allowed defendant's motion for judgment notwithstanding the verdict as to counts 9 and 12.

city, coast-to-coast and throughout the English-speaking world; that investors would make anywhere from fifty to one hundred thousand dollars a year *whether they participated actively or inactively,* and that ASTRA had "exclusives" on the Earl Nightingale records and manuals. Klett further testified Herr stated an active distributor was one who purchased a number of projects consisting of the Earl Nightingale "Strangest Secret" records and success manuals and who then sold or disposed of them as he chose; that ASTRA was not concerned with how the active distributors disposed of the records and manuals; that an inactive distributor was one who did not have the time, or had reached the age where he was unable, to carry on a regular sales program; that, in this case, ASTRA "promised" they had a sales force to sell the records and manuals for the inactive distributors; that the expenses would be subtracted from the sales; that monthly earnings checks would then be distributed to the investors; and that profits were to be "huge", possibly around six per cent a month or more.

There were representations made at a meeting that investors' money would be refunded within five months after request; that they would receive additional money if they brought in other inactive distributors; that the return on the initial investment would be sixty per cent a year; that ASTRA would provide the investor with a second income; that it was going to be the biggest thing they ever encountered; that this investment was a good way to make earnings without additional duties; and that investors would receive a monthly income for life from their investment.

Although numerous investors, both orally and in writing requested that their investment be returned, none was ever returned. This was so in spite of the fact that as late as August, 1962, defendant Herr told investors Sundahl and Stoddard how well the company was doing; that their investment was earning six per cent interest and they should not worry about it. In June 1961 both defendants admitted to investors Edwin and Eleanor Joslyn that ASTRA had no money and could not refund their investment.

According to defendants, the evidence shows that ASTRA's business was "the sale of salestraining material, such as phonograph records, projectors, films and tape recordings * * * " including "records known as 'Strangest Secret', 'Think and Grow Rich' and 'The Money Machine'. * * * " Also they point out that the evidence shows that a distributor was to hire and train his own salesmen, while *inactive* distributors "would purchase merchandise in large quantities and salesmen would sell it receiving the benefit of a large discount. * * * "

As stated in defendants' brief, inactive distributors "purchased" about $150,000 worth of records and manuals.

There was evidence that ASTRA received from inactive distributors $152,-074.90 and that from May 1960 through February 1961, the total amount of earnings paid to them was $46,397.79; that the total amount of ASTRA's net merchandise sales from April 1960 through January 1961 was $42,024.76; that, according to its own books and records, it was not operating at a profit for the period from March 1960 through February 1961; that the exhibits introduced into evidence indicate that ASTRA had no earnings available for distribution to the inactive distributors; that it operated at a loss in every month beginning March 1960 and continuing through February 1961, with the total being $204,734.41.

1. 15 U.S.C.A. § 77b(1) provides:

"(1) The term 'security' means any * * * investment contract, * * * ."

In S. & E. C. v. W. J. Howey Co., 328 U.S. 293, at 300, 66 S.Ct. 1100, at 1104, 90 L.Ed. 1244, the court said:

"Thus all the elements of a profit-seeking business venture are present here. The investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise. It follows that the arrangements

whereby the investors' interests **are** made manifest involve investment contracts, regardless of the legal terminology in which such contracts are clothed. \* \* \*"

■ Accordingly, regardless of the statement in the agreement involved in the case at bar that the relationship created thereby was that of vendor and purchaser, we construe it to be an investment contract. Significantly the facts here show that it was not the intention of either the defendants or the investors that the latter, themselves, were to actually resell the merchandise. They were described as and were actually *inactive.* They were led to believe that they could expect profits solely from the efforts of others.

To the same effect are S. & E. C. v. Bailey, S.D.Fla., 41 F.Supp. 647 (1941), and S. & E. C. v. Crude Oil Corp., 7 Cir., 93 F.2d 844, 848 (1937), which are both cited in Howey.

■ 2. After judging the evidence in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680, and relying on all inferences which may reasonably be drawn from that evidence, United States v. Hamilton, 7 Cir., 276 F.2d 96, 98 (1960), we are convinced that defendants employed a scheme to defraud investors and made countless false and fraudulent representations in order to successfully effectuate that scheme.

■ The law has been long established that a scheme to defraud may consist of suggestions and promises as to the future, when not made in good faith but with deceptive intent. Thus in Durland v. United States (1896), 161 U.S. 306 at 314, 16 S.Ct. 508, at 511, 40 L.Ed. 709, the court said:

" \* \* \* It was with the purpose of protecting the public against all such intentional efforts to despoil, and to prevent the post office from being used to carry them into effect,

that this statute was passed; and it would strip it of value to confine it to such cases as disclose an actual misrepresentation as to some existing fact, and exclude those in which is only the allurement of a [specious and glittering] promise. \* \* \*"

Durland was followed in United States v. Comyns, 248 U.S. 349, 353, 39 S.Ct. 98, 63 L.Ed. 287 (1919).

■ 3. Defendants contend that the district court should have granted them a new trial when the jury found them not guilty of conspiracy to defraud but found them guilty on the other counts. They rely upon Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L. Ed. 790 (1949), and Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L. Ed. 593 (1953). These cases dealt with declarations made by one conspirator after the conspiracy had terminated.

In Burns v. United States, 10 Cir., 286 F.2d 152 (1961), Burns and four other persons and two corporations were prosecuted under a 31-count indictment charging violations of the securities act, the mail fraud statute and the general conspiracy statute. A verdict of guilty was returned against Burns and one corporation on the fifteen counts under the securities act and not guilty on all of the other counts. Burns contended his acquittal on the conspiracy count required acquittal on the securities act counts. However, at page 155, the court said:

" \* \* \* The answer is that each count of an indictment is regarded as a separate indictment and consistency in the verdicts is not necessary."

It relied on Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356; Blackford v. United States, 10 Cir., 195 F.2d 896, 899, cert. den. 343 U.S. 945, 72 S.Ct. 1041, 96 L.Ed. 1350; and Thomas v. Hudspeth, 10 Cir., 127 F.2d 976, 978.[2]

In Coplin v. United States, 9 Cir., 88 F.2d 652, 661 (1937), where defendants

---

**2.** Cf. United States v. Dotterweich, 320 U.S. 277, 279, 64 S.Ct. 134, 88 L.Ed. 48,

rehearing denied 320 U.S. 815, 64 S.Ct. 367, 88 L.Ed. 492.

were found not guilty on a conspiracy count and guilty on other counts, the court said:

" * * * Verdicts on various counts of an indictment need not be consistent. This question has been so recently and so fully discussed by this court that voluminous citation of authority is unnecessary. See Macklin v. United States (C.C.A. [9]) 79 F. (2d) 756, 758–759, and the cases there cited."

We are unimpressed by defendants' argument that it is reasonable to assume that the jury's verdict was based on the accumulation of evidence introduced, much of it under the guise of proving a conspiracy, and not on the evidence introduced to support the substantive counts of the indictment.

■■ 4. We now proceed to consider defendants' argument that various errors occurred during the trial below.

(a) On cross-examination of defendant Herr by government counsel, Herr denied that he had sold stock of the Craig Oil and Gas Company. In rebuttal the government called Peter Kurek as a witness to an investment he made through Herr in Craig Oil and Gas Company in January 1958, being 50,000 shares of stock for $1,000. This was error, defendants say.

We hold that the rebuttal testimony of Kurek was germane to the testimony of Herr on cross-examination. There was no error in this suspect.

(b) When testifying as a rebuttal witness, Kurek under cross-examination by defense counsel was interrogated about some paper which he had allegedly shown at a meeting of a society. On redirect examination by the government, Kurek identified that paper (government exhibit 470) and stated that he had passed out copies thereof. It appears to be a press release covering the return of the indictment in this case.

The purpose of the cross-examination was to show the alleged bias and animosity of Kurek toward defendants. The release was admitted into evidence. A mistrial motion by defendants was denied according to defendants' brief. We find no record thereof. However, we have read the exhibit and find that it contains nothing prejudicial to defendants. The court committed no errors in its rulings in reference thereto.

(c) In wholesale fashion, defendants urge that the court should have granted defendants' many motions for mistrial and for continuance and, having refused to do so, should have granted defendants' motions for a new trial which he failed to do, thus committing error.

We have considered all of these rulings. We find no error.

For the reasons herein stated the judgments from which this appeal has been taken are affirmed.

Judgments affirmed.